**TOM LANGE COMPANY, INC., Plaintiff,**

v.

**A. GAGLIANO COMPANY, INC., Defendant.**

No. 91–C–852.

United States District Court, E.D. Wisconsin.

July 28, 1994.

Thomas L. Smallwood, Borgelt, Powell, Peterson & Frauen, S.C., Milwaukee, WI, for plaintiff.

Robert G. LeBell, Styler, Kostich, LeBell & Dobroski, Milwaukee, WI, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

The above-captioned case is controlled by the Perishable Agricultural Commodities Act of 1930 as amended (hereinafter "PACA"), codified at 7 U.S.C. § 499a *et seq.* In addition, the applicable regulations are found in 7 C.F.R. § 46 *et seq.*

Pursuant to the PACA, a *de novo* trial[1] to the Court occurred on January 24, 1994 on A. Gagliano Company's (hereinafter "Gagliano") petition for review of a decision rendered by the Secretary of the Department of Agriculture (hereinafter "Secretary") which ordered Gagliano to pay reparation for a shipment of lettuce in the amount of Three Thousand Four Hundred Sixty–Eight Dollars and Twenty–Six Cents ($3,468.26) to the respondent, Tom Lange Company, Inc. (hereinafter "Lange").

---

**1.** 7 U.S.C. § 499g(c) provides in part: "Such suit in the district court shall be a trial de novo...."

The Secretary held a hearing pursuant to 7 U.S.C. § 499f and 499g, applied 7 C.F.R. §§ 46.22 and 46.23 [2] to the facts at bar, and found that a "price after sale" contract for the lettuce in question existed and that Gagliano failed to meet the dumping requirements for that lettuce found in § 46.23. Further, on a motion for reconsideration, the Secretary found that if the sections in 7 C.F.R., such as § 46.23, did not apply to this "price after sale" contract the standards of those sections would be found in the case law governing dealings under the PACA. (Citing to *Anonymous,* 5 Agric.Dec. 25, 26 (1943)). The Secretary found that Gagliano failed to produce adequate evidence to show that the lettuce was of no commercial value. The Secretary concluded that Gagliano failed to adequately comply with recordation requirements of the PACA and other and similar PACA standards.

Gagliano argued at trial and in his Post Trial Memoranda that §§ 46.22 and 46.23 do not apply to a "price after sale" transaction, that it acted in a "reasonable fashion under the totality of the circumstances," (i.e., in "good faith") (Gagliano's Post Trial Memorandum, p. 3), and finally, if the requirements of §§ 46.22 and 46.23 are applicable, Gagliano's compliance with them was waived because Lange agreed with the actions Gagliano took.

As subsequently discussed, the facts are basically not in dispute. Essential to this decision are the standards of law to be applied.

## FACTUAL BACKGROUND

■ First the facts. Although this was a *de novo* trial to the Court, the Secretary's Findings of Fact are not to be disturbed unless those findings are rebutted by specific evidence. *See Consolidated Citrus Company v. Goldstein,* 214 F.Supp. 823 (E.D.Pa.1963). While the trial *de novo* is a:

[T]rial anew of the entire controversy, including the hearing of evidence as though no previous action had been taken ... [the] findings and orders (of the Secretary) shall be *prima facie* of the facts therein stated. That means that they shall stand as the established facts until sufficient evidence is produced on the trial to overcome them.

*Spano v. Western Fruit Growers, Inc.,* 83 F.2d 150, 151 (10th Cir.1936).

This interpretation is consistent with 7 U.S.C. § 499g(c) which provides in part:

has no commercial value from any person authorized by the Department to inspect fruits and vegetables. Where such inspection service is not available certification may be obtained from (a) any health officer or food inspector of any State, county, parish, city or municipality or of the District of Columbia; (b) any established commercial agency or service making inspections for the fruit and vegetable industry; or (c) when no inspector or health officer designated above is available consideration will be given to other evidence such as inspection and certification made by any two persons having no financial interest in the produce involved or in the business of any person financially interested therein, and who are unrelated by blood or marriage to any such financially interested person, and who, at the time of the inspection and certification, and for a period of at least one year immediately prior thereto, have been engaged in the handling of the same general kind or class of produce with respect to which the inspections and certification are to be made. Any certificate issued by any persons designated in paragraph (c) of this section shall include a statement that each of them possesses the requisite qualifications.... (emphasis ours)

2. **§ 46.22 Accounting for dumped produce.**

A clear and complete record shall be maintained showing justification for dumping of produce received on joint account, on consignment, or handled for or on behalf of another person if any portion of such produce regardless of percentage cannot be sold due to poor condition or is lost through resorting or reconditioning. In addition to the foregoing, if five percent or more of a shipment is dumped, *an official certificate, or other adequate evidence,* shall be obtained to prove the produce was actually without commercial value, *unless there is a specific agreement to the contrary between the parties....* (emphasis ours)

**§ 46.23 Evidence of dumping.**

Reasonable cause for destroying any produce exists when the commodity has no commercial value or when it is dumped by order of a local health officer or other authorized official or when *the shipper has specifically consented to such disposition....* When produce is being handled for or on behalf of another person, proof as to the quantities of produce destroyed or dumped in excess of five percent of the shipment shall be provided by procuring an official certificate showing that the produce

Such suit in the district court shall be a trial *de novo* and shall proceed in all respects like other civil suits for damages except that the findings of fact and order or orders of the Secretary shall be *prima facie* evidence of the facts therein stated.

In *Consolidated Citrus* the court, citing *Spano, supra,* stated:

[T]he Act creates a rebuttable presumption that these [the Secretary's findings] are established facts until sufficient evidence is introduced at trial to rebut them.

*Id.* at 826, n. 5.

And, further, in *Spano:*

It establishes a rule of evidence that does not prevent any defense. It does not interpose an obstacle to the presentation of any contest on the issue, nor does it take away the right of either party to introduce any pertinent or relevant evidence.

*Id.* at 152.

Applying those standards to the case at bar, the Court adopts the relevant factual findings of the Secretary *in toto* contained in the order dated May 17, 1991, in addition to the following. Although the evidence offered at the trial, which consisted solely of the testimony of Gagliano's owner, Anthony Gagliano, did not rebut the facts contained in the Secretary's decision, it did serve to offer an explanation of those facts creating an expanded factual setting which will be addressed below.

Because the Court adopts the relevant factual findings[3] of the Secretary, it incorporates them by reference.

Thus, one hundred forty-four (144) cartons of artichokes and six hundred and sixty-five (665) cartons of lettuce were shipped in interstate commerce on or about September 10, 1988 and delivered with the concurrence of all parties to Gagliano in Milwaukee, Wisconsin, on a *price after sale basis.* The ship-

ment arrived at Gagliano's place of business on September 13, 1988, where it was accepted. There is no dispute as to the quality of or the accounting for the artichokes. Gagliano claims that the lettuce did not meet good delivery standards. Lange issued an invoice to Gagliano relating to the produce in question which, in pertinent part, stated that price was to be determined after sale and that "good delivery standards apply, excluding bruising and/or discoloration following bruising."

No federal inspection was made of the lettuce, nor was there a certification from a state or local health officer or food inspector or from an established commercial inspection service. Gagliano did submit three letters from merchants in the industry stating that they inspected lettuce on September 28, 1988 and found that it had no commercial value and was unfit for human consumption.[4]

Based essentially on these facts, the Secretary ordered Gagliano to pay Lange the Three Thousand Four Hundred Sixty–Eight Dollars and Twenty Cents ($3,468.20) in reparation amounts. In making this order, however, the Secretary was not apprised of the following "explanatory" facts offered at trial by Anthony Gagliano.

Thus, while Gagliano did not issue a written account of sale to Lange until October 14, 1988, Anthony Gagliano's un-rebutted testimony at trial was that this was done with the oral concurrence of Lange through its agent, David Osborn (hereinafter "Osborn").[5] And while no federal inspection of the lettuce was made, nor certification of state or local health officers or food inspectors obtained, and while no dumping certificate was acquired, this also, according to Gagliano's unrebutted testimony at trial, was with the oral concurrence of Lange. In other words, if there was a deviation from proper procedure there was a mutual oral modification of that procedure.[6]

---

3. The incorporation includes the "Preliminary Statement" on Pages 1 through 5 of the Secretary's Decision and Order.

4. As previously stated, these facts were not rebutted by the sole witness at the trial, Anthony Gagliano. Indeed, the Court finds that Anthony Gagliano's testimony, and the exhibits received at trial, support these findings.

5. David Osborn was the agent authorized to act on Tom Lange Company's behalf.

6. Lange, on page 3 of its Post–Trial Memorandum, cites to an "Answering Statement" filed by Gagliano on January 9, 1990 with the U.S. Department of Agriculture wherein Gagliano swore that he had no contact with David Osborn until October of 1988 and that David Osborn was not

In this connection, Anthony Gagliano testified that when he receives a shipment that is shipped on a "price after sale" basis [7] he first inspects the product. He did so in this case. He then testified that Gagliano called Lange and advised them of what they deemed to be bad merchandise. In acknowledging that Gagliano is responsible for the shipper's merchandise, Anthony Gagliano then stated that with the approval of Lange, again through Osborn, he attempted to sell the lettuce to various levels of customers that might find use for it. He testified that he had a "carte blanche" to get rid of the lettuce. Anthony Gagliano testified that he spoke to Osborn two to three times daily keeping him apprised of the disposition of said lettuce.

In addition, Anthony Gagliano testified that in these conversations the issue of dumping the lettuce load was brought up from the very first day. In these conversations on dumping, he testified that Osborn did not require a dump certificate from the United States Department of Agriculture and was told not to incur the additional expense of acquiring said certificate. Gagliano was told by Osborn to get rid of the lettuce as best he could. According to Anthony Gagliano, Osborn in effect approved the certification of the condition of the lettuce by local merchants.

The Court must decide the case in light of these additional and "explanatory" facts.

### ANALYSIS

#### A. PACA Purpose and Standards.

The standards applicable to any PACA transaction are found in the language of the statute, its regulations, and the case law. Those standards in turn must be interpreted consistent with the purpose of the law.

Thus we find the following relative to the statutory purpose:

Clearly the Act was intended to *regulate all persons who operate in the business* of dealing with perishable agricultural commodities in interstate commerce. (emphasis ours)

*Consolidated Citrus, supra.* at 827.

The *purpose* of the Perishable Agricultural Commodities Act is to suppress unfair and fraudulent practices in the marketing of fresh fruits and fresh vegetables. (emphasis ours)

*Id.* at 826.

The PACA is a remedial statute *designed* to insure that commerce in agricultural commodities is conducted in an atmosphere of financial responsibility.... It is an *intentionally rigorous law whose primary purpose is to exercise control over an industry* 'which is highly competitive and in which the opportunities for sharp practices, irresponsible business conduct and unfair methods are numerous.' (emphasis ours)

*Harry Klein Produce Corp. v. U.S. Dept. of Agriculture,* 831 F.2d 403, 405 (2d Cir.1987).

The original PACA enactments "served to provide a practical remedy to growers who were vulnerable to sharp practices of financially irresponsible and unscrupulous brokers in perishable commodities." *See Chidsey v. Guerin,* 443 F.2d 584, 587 (6th Cir.1971).[8] While the PACA generally has worked well in making the marketing of perishable agricultural commodities more orderly and efficient, Congress, nevertheless, amended the PACA in 1984 to "provide additional protection to *produce sellers* " (emphasis ours). *Hull Company v. Hauser's Foods, Inc.,* 924 F.2d 777 (8th Cir.1991). Clearly the PACA is remedial in its thrust and, as

---

even involved in the negotiations dealing with the subject produce. Lange argues from this that since this is contrary to Gagliano's trial testimony, the trial testimony should not be given any weight. Gagliano argues that the "Answering Statement," attached as Exhibit One to Lange's Post–Trial Memorandum, is "outside of the certified record" and cannot be considered. Gagliano's position appears correct and the Court will not consider the "Answering Statement."

**7.** "Price after sale" transactions comprise twenty-five percent (25%) of Gagliano's business. (Trial transcript, p. 14).

**8.** As will become clear *infra,* the Court does not conclude that Gagliano's actions were fraudulent or unscrupulous but rather, they failed to comport with the strict procedural requirements of the PACA.

stated in *Hull* at page 782, "remedial legislation should be given a liberal construction to effectuate its statutory purpose."

The following are standards relevant to PACA transactions.

7 U.S.C. § 499b(3) provides:

It shall be unlawful in or in connection with *any transaction* in interstate or foreign commerce....

For any commission merchant to discard, dump or destroy without *reasonable cause,* any perishable agricultural commodity received by such commission merchant in interstate or foreign commerce. (emphasis ours).

In connection with the above quote, "reasonable cause" is defined in § 46.23 (*see infra* note 2) as existing "When the commodity has no commercial value or when it is dumped by order of a local health officer or other authorized official or when the shipper has specifically consented to such disposition."

Section 46.22 (*see infra* note 2) also calls for:

A clear and complete record, ... showing justification for dumping of produce received on joint account, on consignment, or handled for or on behalf of another person ... [An official certificate is required if more than five percent of a produce lot is dumped,] unless there is specific agreement to the contrary between the parties.

Section 46.14 places the following burden on all those subject to the Act and on "all transactions involved in his business."

(a) Every commission merchant, dealer, and broker shall prepare and preserve for period of two years from the closing date of the transaction, the accounts, records and memoranda required by the Act, which shall fully and correctly disclose *all transactions involved in his business....* It is impracticable to specify in detail every class of records which may be found essential since many different types of business are conducted in the produce industry and many different types of contracts are made covering a wide range of services by agents and others. *The responsibility is placed on every licensee to maintain records which will disclose all essential facts regarding the transactions in his business.* (emphasis ours).

Section 46.15 outlines in great detail, *without being exclusive,* the need to preserve documents on each "lot of produce." Section 46.15 provides:

Bills of lading, diversion orders, paid freight and other bills, car manifests, express receipts, confirmations and memorandums of sales, letter and wire correspondence, inspection certificates, invoices on purchases, receiving records, sales tickets, copies of statements (bills) of sales to customers, accounts of sales, papers relating to loss and damage claims against carriers, records as to reconditioning, shrinkage and dumping, daily inventories by lots, a consolidated record of all rebates and allowances made or received in connection with shipments handled for the account of another, an itemized daily record of cash receipts, ledger records in which purchases and sales can be verified, and all other pertinent papers relating to the shipment, handling, delivery, and sale of each lot of produce shall be preserved for a period of two years.

Section 46.26 clearly highlights and emphasizes that although the obligations imposed on commission merchants, dealers and brokers, as licensees are multifarious and detailed they are, also, not all inclusive. Section 46.26 provides:

It is impracticable to specify in detail all of the duties of brokers, commission merchants, joint account partners, growers, agents, and shippers because of the many types of businesses conducted. Therefore, the duties described in these regulations are not to be considered as a complete description of all of the duties required, but as merely a description of their principal duties. *The responsibility is placed on each licensee to fully perform any specification or duty, express or implied, in connection with any transaction handled subject to the Act.* (emphasis ours).

**B. Sections 46.22 and 46.23.**

 The Court finds that §§ 46.22 and 46.23 are applicable to "price after sale" con-

tracts. A "price after sale" transaction was defined at trial by Anthony Gagliano and summarized in Gagliano's Post Trial Memorandum at page 6 as follows:

[A]pproximately twenty-five percent (25%) (of shipments) occur on a 'price after sale basis.' (Trial Transcript p. 14). The purpose of the 'price after sale' condition is to accommodate a shipment of less than Grade A or sub par produce which is being shipped to a distributor. It is an attempt by a distributor to dispose of produce which, it is understood by both parties, is of less than top quality. More specifically, it is understood that in a 'price after sale' transaction, the receiver will reasonably attempt to sell the sub-standard produce for whatever the market will bring. A price after sale shipment is immediately inspected after which the shipper is advised of the condition of the merchandise. (Trial Transcript, pp. 17, 18). The receiver then can elect either of the following options: reject the shipment or try to sell it. (Trial Transcript, p. 18). The proceeds from whatever sales can be consummated are then credited to the shipper. At all times relevant to such transaction, the receiver has cart blanche authority to get rid of the produce. (Trial Transcript, p. 19).

From this, Gagliano concludes at page 11 of its Post Trial Memorandum that:

It is logical that the C.F.R. provisions would not apply to "price after sale" transactions because of the nature of such sales. A "price after sale" transaction is an implicit recognition by both parties of the flawed and sub-standard condition of the produce. The dumping certificate requirements of §§ 46.22 and 46.23 are in place to insure consistency in the way commodities businesses deal with unexpected damage and deterioration of the produce. The sections were enacted to address produce which does not meet the expectation of the parties as previously contracted and agreed. In the "price after sale" transactions, the parties expect, recognize and

acknowledge the defective nature of the produce. Even the Examiner in its decision which addressed the petitioner's motion for reconsideration noted that 7 C.F.R. § 46.23 may not be applicable to the instant case. (See Order on Reconsideration, p. 2). Accordingly, any order based on the petitioner's noncompliance with § 46.23 would be erroneous as a matter of law and fact.

Nowhere in the PACA does it specifically state that "price after sale" transactions are exempt from §§ 46.22 and 46.23 requirements. Indeed, the language in § 46.22 that "A clear and complete record shall be maintained showing justification for dumping of produce ... handled for or on behalf of another person ..." is language that very easily applies to "price after sale" transactions.

■ These sections were not solely "enacted to address produce which does not meet the expectations of the parties as previously contracted and agreed." (Gagliano's Post Trial Memorandum, p. 11). They were enacted to deal with *any* produce that ultimately requires dumping. A "price after sale" transaction, though it anticipates produce of less than Grade A quality, does not at its inception assume that the produce will automatically be dumped.[9]

Therefore, the requirements of §§ 46.22 and 46.23 apply to any transaction where dumping is contemplated. This is consistent with the dictate of § 499b(3): "It shall be unlawful in or in connection with *any transaction* in interstate or foreign commerce ... (3) for any commission merchant[10] to discard, dump, or destroy without reasonable cause *any* perishable agricultural commodity." (emphasis ours.)

As previously stated, "reasonable cause" for destroying any produce exists when the commodity has no commercial value or when it is dumped by order of the official authorized therein or when the shipper has specifi-

---

9. Indeed Anthony Gagliano testified that there are various strata of customers that he offered the produce to that may have used it even though it was sub par. (Trial Transcript, pp. 30–32).

10. In Gagliano's answer to Lange's complaint, Gagliano admits to being a dealer, commission merchant and/or broker, therefore subject to the Act.

cally consented to such disposition. *See* § 46.23.

In this connection, Gagliano's position that "the receiver has carte blanche authority to get rid of the produce" (Trial Trans. p. 19) is inaccurate to the extent that it conflicts with the strict requirements of the PACA.

Gagliano was bound by the "standards" contained in §§ 46.22 and 46.23 including § 499b(3). Gagliano argues that the Secretary's ruling in regard to Gagliano's Motion for Reconsideration concludes that § 46.23 may not be applicable to the instant case. Gagliano cannot rely on the Secretary's conclusion.[11] What is clear from the Secretary's order on reconsideration is this: Even if it is not stated with particularity that § 46.23 directly applies to "price after sale" contracts, it clearly applies by implication. Thus, the Secretary was correct in citing to *Anonymous*, 5 Agric.Dec. 25, 26 (1943) for the proposition that:

> When perishable commodities are dumped it is usual to produce a certificate issued by the health department of the city or other authority showing the necessity for dumping, and where proof of damages rests on such necessity, lack of proof for the necessity for dumping precludes recovery. (Order on Reconsideration, p. 2)

The Secretary is correct in his application of these requirements to this case because as § 46.26 makes clear the list of enumerated duties and obligations of a licensee under the PACA is not exclusive. "[T]he duties discussed in these regulations are not to be considered as a complete description of all the duties required, but as merely a description of their principal duties." This is so because "It is impracticable to *specify in detail all of the duties of brokers, commission merchants*, shippers, because of the *many types* of businesses conducted." (emphasis ours) *See* § 46.26.

Necessarily then all licensees are required to perform "*any specification or duty ex-*

press or implied, in connection with any transaction handled subject to the Act." (emphasis ours) *See* § 46.26. Clearly if § 46.23 does not expressly apply, it applies by implication.

A "price after sale" contract certainly falls into the category of "any transaction handled subject to the act" and/or one "of the many types of businesses conducted" under the Act. *See* § 46.26. Parties to a "price after sale" contract are bound by the express principal duties outlined in the PACA and all those that can be implied therefrom. Parties to a "price after sale" contract cannot be exempt from the stringent procedures that relate to one of the most critical and important aspects of any commodities contract; the destruction of produce. Such a ruling would be entirely inconsistent with the tenor of the PACA.

Congress intended to create an "intentionally rigorous law," *Harry Klein, supra* at 405, to "regulate all persons who operate in this business" (perishable commodities) (*Consolidated Citrus, supra* at 827). Its intent was to control the "many types of businesses" conducted in the perishable commodities trade through the application of detailed duties both express and implied. Without doubt this intent was not to exclude "price after sale" contracts from the rigorous standards that apply to all other transactions.

Supportive of this conclusion is the fact (and Gagliano does not argue the point) that "price after sale" contracts are expressly subject to the requirements of §§ 46.14 and 46.15.

Section 46.14 places the burden on Gagliano to make detailed records on *all transactions*. "Price after sale" transactions are necessarily included in "all transactions" and "each lot of produce."

Section 46.15 clearly requires maintenance of a detailed list of documents and "all other pertinent papers relating to *each lot of produce.*"

---

**11.** The Secretary stated, "Even assuming that respondent is correct as to whether or not § 46.23 applies to the instant case, and it may not be, *see Cleveland Celery Market v. Central Foods*, 40 Agric.Dec. 858 (1981), in which § 46.23 is cited in support of a similar ruling, our ruling on the merits would not have been affected." (Order on Reconsideration, p. 2) This language, phrased as it is, discloses that the Secretary thought that Gagliano may be more incorrect than the Secretary.

Because §§ 46.22 and 46.23 and the other PACA provisions discussed apply to the facts of this case, either directly or by implication through § 46.26, Gagliano was required to observe them. Clearly, Gagliano failed to get an official certificate required by § 46.22. Gagliano also failed to get an "order of a local health officer or other authorized official" pursuant to § 46.23. Finally, Gagliano did not keep detailed records of this transaction and therefore it failed to show adequate proof of the commercial value of the produce.

However, Gagliano may fall within one of the exceptions contained in these sections. Thus, as to § 46.22, an official dump certificate is not required "if there is a specific agreement to the contrary" or if "other adequate evidence" is obtained. In addition, if under § 46.23 a shipper has "specifically consented to such disposition," (i.e., destruction of produce) "reasonable cause" for destruction is established and no dump order is required. Did Gagliano have a "specific agreement" with Lange under § 46.22 so that a certificate was unnecessary? Did Gagliano offer "other adequate evidence" of a lack of commercial value if no "specific agreement" was reached under § 46.22? Did Lange "specifically consent" to the dumping of the produce under § 46.23?

### C. Lange's Waiver/Gagliano's Compliance

#### (1) "Specific Agreement" under Section 46.22.

■ Gagliano argues that the oral testimony at trial established that Lange specifically agreed pursuant to an oral arrangement that no official dump certificate was required. While Gagliano framed this argument in the

form of a waiver by Lange, it is more properly framed as Gagliano's compliance with § 46.22, i.e. there was no need for an "official certificate" because there was a "specific agreement to the contrary." [12]

In this regard, the testimony of Anthony Gagliano discloses that there was an oral agreement with Lange (through Osborn) to forego the relevant PACA requirements. There was, in effect, a specific oral agreement to forego the specified dumping requirements of § 46.22. *An oral agreement, however, is not enough.*

In order for there to be a "specific agreement to the contrary" under § 46.22 to waive the requirement of an official dump certificate, *more than an oral agreement and more than oral testimony relative to that agreement is necessary.*[13] It must be in writing or supported by the specific and detailed documentation required by the PACA. This standard is consistent with the strict recording and reporting requirements of §§ 46.14 and 46.15, with the language of § 46.22, and with the tenor of the law which is designed to be and must be "intentionally rigorous" to exercise control over this industry. While § 46.22 does not state that a "specific agreement" be "in writing," the use of the word "specific," coupled with PACA's strict recording requirements and the tenor of the Act, clearly suggests that "specific agreement" means a specific written document describing the agreement or specific and detailed documents that are supportive of such an agreement.

Instructive in this regard is *Hull Company, supra* wherein an oral agreement between the buyer and the seller to extend the

12. If Gagliano's argument is that Lange waived *Gagliano's need* to comply with § 46.22's dumping requirements, including the exceptions, it is clearly without merit. Because both Lange and Gagliano are by law subject to and regulated by all provisions of the PACA they cannot agree to opt out of them. Thus, the issue remains did Lange and Gagliano have a "specific agreement to the contrary"? On the other hand, if Gagliano is arguing that Lange waived *Lange's* right to rely on the requirements of the PACA, that argument suffers the same fate. *See Hull infra,* for the proposition that *oral* agreements to the contrary, a party is not foreclosed from relying upon the provisions and standards of the PACA.·

13. In this regard *see Cleveland Celery Market Company v. Central Foods Inc., Formerly Empire Food Inc.,* 40 Agric.Dec. 858 (1981). "[T]estimonial evidence by interested parties as to the condition of produce must be discounted due to the wide availability of government inspection or inspections of other qualified neutral parties. A further reason for the discounting of such evidence is the usually imprecise nature of such testimony." Just as oral testimony relative to the condition of produce must be discounted, so too must it be discounted relative to whether or not a "specific agreement" exists.

time for payment under the prompt payment requirements of the PACA was rejected. Even though this section of the PACA directly states that "parties who elect to use different times for payment must reduce their agreement to writing," the court went on to state "We believe that recognizing only written agreements to extend the time for payment beyond ten (10) days best promotes the legislative scheme and the general purpose Congress has manifested." Consistent with the regulatory scheme of PACA, "the times of payment must be disclosed on invoices, accounting, and other documents relating to the transaction." If agreements to extend the terms for payment must be in writing, an agreement relative to the destruction of produce should also. Since there was no specific agreement in writing or specific documentation supporting a specific agreement, Gagliano cannot lay claim to this exception.

### 2. "Other Adequate Evidence" under Section 46.22.

■ If there was no "official certificate" and no "specific agreement" under § 46.22, Gagliano may still show by "other adequate evidence" that the produce that was destroyed was without "commercial value."

Gagliano's substantial reliance upon the oral testimony offered at trial, coupled with its limited recordation of the transaction, does not support a finding that the produce was without commercial value. It does not rise to the level of "other adequate evidence."

"Other adequate evidence" is evidence that is a substitute for or an alternative to "an official certificate." Because an "official certificate" or "other adequate evidence," is required when more than five percent (5%) of produce is subject to destruction, it means more than the "clear and complete record" required when less than five percent (5%) of produce is destroyed.

Because Gagliano's limited recordation effort under §§ 46.14 and 46.15 does not meet the "clear and complete record" standard (required when less than five percent (5%) of produce is subject to destruction), it necessarily fails in its attempt to meet the "other adequate evidence" standard.

Where there is a failure to comply with the rigorous recordation requirements of §§ 46.-14, 46.15, and other sections of the PACA, that failure cannot be overcome by oral testimony at trial. Oral testimony, in the absence of the required records, must be discounted. (*See infra* note 13).

As previously stated, Gagliano did very little to observe the duty he owed under § 46.15 to preserve documents in relation to this transaction. While Gagliano testified that every piece of documentation connected with the transaction goes into file, he could produce very little of the pertinent documentation relative to this transaction and to the arrangement/agreement that he testified he orally entered into with Osborn of the Lange Company, Inc. Gagliano did not have any written notes or records or inspections or communications with the Lange Company regarding this shipment.[14] In addition, telephone records, or telephone bills, which could be used to verify the conversations that were the core of the agreement that Gagliano testified to, were not produced.

### 3. "Specific Consent" under Section 46.23.

■ Gagliano also failed to acquire the required dump certificate under § 46.23 and failed to supply the necessary recordation as to the worth of the produce. However, if Lange "specifically consented" to the destruction of the produce in question, Gagliano had no need to meet the requirements either under § 46.22 or § 46.23. As is the case with a "specific agreement" under § 46.22, "specific consent" under § 46.23 means first and foremost a *specific written consent.* The rationale for this position is contained in Section C(1) "Specific Agreement" of this opinion and need not be related here. (*See infra* pp. 364–365). It is incorporated by reference. Here, too, Gagliano can produce no specific *written* consent, nor the detailed and complete documentation required by §§ 46.14 and 46.15 and elsewhere in the PACA to support the position that "specific

---

**14.** A bill of lading from Lange marked Exhibit "I" was offered by Gagliano and received into evidence. Essentially this was the only documentation which touches on Gagliano's conversations with Osborn and or the commercial value of the produce.

consent" for the destruction of the produce in question was given and that therefore there was reasonable cause for its destruction.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. The Findings of Fact and Conclusions of Law rendered by the Secretary on May 17, 1991 are **AFFIRMED.** The Findings of Fact and Conclusions of Law, upon motion for reconsideration, rendered by the Secretary on July 8, 1991, are **AFFIRMED;** and

2. Lange shall be entitled to actual costs and disbursements, including reasonable attorney's fees, as part of those costs in defending this action.

**SO ORDERED.**